Raymond L. Wilkes, J.
On the face of it, these are merely two motions by the District Attorney for orders restoring two cases (those of Jerry A. Fusco and his brother, Michael Fusco) *148 to the Trial Calendar and precluding them from admission to the Operation Midway Program. However, the broader thrust of these applications is the claim by the District Attorney that before the Administrative Judge of the County Court, in the exercise of his discretion, may consider a defendant for Operation Midway, the "consent” of the District Attorney is required.
For a genuine understanding of what is at stake, a history of Operation Midway-type diversion programs is clearly in order. The following background emerges from a scholarly article by Franklin E. Zimring, Professor of Law at the University of Chicago and codirector of the Center for Studies in Criminal Justice, as it appeared in the University of Chicago Law Review (Vol 41, pp 224-225, 238).
"In 1967 the Vera Institute of Justice established the Manhattan Court Employment Project to divert criminal defendants, after their arraignment on felony or misdemeanor charges, into a program of group therapy and employment counseling. If a defendant succeeds in a program and obtains a job, his pending criminal charges are dismissed. The goals of this innovative program are eloquently stated in the Vera Institute’s ten year report:
" 'The Manhattan Court Employment Project aims to stop the development of criminal careers by entering the court process after an individual has been arrested but before he has been tried, and giving him the kind of counseling and opportunity for starting on a legitimate career that he needs and otherwise is not able to obtain. The defendant is offered the possibility that the charges against him will be dismissed, provided he is cooperative and responds to counseling and job placement within a 90-day period granted by the court.
" 'It is, in other words, an attempt to convert his arrest from a losing to a winning experience — to build a bridge for the accused between the fractured world of the street and the orderly world of lawfulness and responsibility. The defendant wins because he gets a job he likes and the charges against him are dismissed * * * and society wins also because an individual who may be developing a criminal life style has been converted into a working employee and taxpayer. Meanwhile, the criminal justice system has been relieved of the need to maintain him in jail or prison, perhaps regularly throughout his life.’
"Measured by its community acceptance and the extent of *149 its emulation in other cities, the Project is one of the most spectacular successes in the history of criminal justice reform. The Court Employment Project currently is a New York City corporation with a $3,000,000 budget and 2,500 cases a year, which means that this program diverts more criminal defendants than many cities arrest; look-alike projects have been established all over the United States. In October, 1973, the United States Senate unanimously passed a bill providing for pretrial diversion and services in the federal system, modeled largely on the Court Employment Project;[4] a similar bill is now pending in the House.[5] * * *
"Early diversion is best viewed as a multigoal process offering two scarce commodities — nonprosecution and expensive, albeit coerced, treatment services — to a small proportion of criminal defendants. The goals of such programs including building job skills, providing job placement, reducing recidivism, and ameliorating the harmful consequences of contact with the criminal justice system. Under those conditions, a number of tradeoffs are necessarily encountered in selecting the defendants eligible for such projects and in allocating project resources. For example, should the project divert the defendants who will represent the lowest risk to the community or the defendants who will benefit most from the treatment? If project treatment reduces criminality, these two groups will not contain the same type of defendant. The lowest risk to the community is created when the group least likely to be arrested in any event is returned to the streets. Treatment cannot greatly improve with this group, if only because it does not have far to go. In contrast, effective treatment is most efficiently directed to the defendants who need such treatment most, because they exhibit a higher degree of danger, even though community treatment of this group presents greater danger of further crime. If scarce penicillin cures both pneumonia and colds, it is allocated ñrst to the pneumonia cases. ” (Emphasis supplied.)
However, before digressing too far historically, we must bear in mind that it was in the foregoing background that Operation Midway found its setting — progeny of the Manhattan project.
In 1972, five years after the inception of the Manhattan *150 Court Employment Project, Nassau County’s Operation Midway Project was born.
Prior to Midway, few if any pretrial services focused on the felony offender. Innovations in pretrial programs related mainly to bail reform, community relations and crime prevention; to the juvenile, the first offender, the misdemeanant, and the drug abuser. Postconviction and postadjudication programs and services for young offenders commanded much attention and a great deal of funds. However, their success, in terms of reduced recidivism and lasting rehabilitation were largely untested and left much to be desired.
In addition, the stigma of conviction, the disabilities of a criminal record and the debilitating effects of incarceration all mitigated against the best efforts of professionals who were attempting to help young people move out of the orbit of the criminal justice system.
With this prelude, the director of the Nassau County Probation . Department in co-operation with the Administrative Judge of the Nassau County Court, the District Attorney, the Nassau County Crime Council, members of the Nassau County Bar — with funds supplied by the Federal Law Enforcement Assistance Administration (LEAA) — initiated the Midway experiment oriented towards young persons (16-25) indicted for felony offenses.
The criteria for admittance into the program and rules for behavior are as follows:
(1.) candidate must be a resident of Nassau County (actual residence, not simply legal residence);
(2.) candidate must be between the ages of 16 and 25 (inclusive) at the time the crime was committed;
(3.) candidate must be charged with a felony crime and indicted by the Grand Jury — excluded are those felonies which carry a mandatory prison sentence (this includes all prior felony offenders);
(4.) candidate must not be under probation or parole supervision, including New York State Drug Abuse Control Commission aftercare;
(5.) candidate must not be serving a sentence in a county jail or State correctional institution;
(6.) candidate must not be in residence in a psychiatric or other treatment facility; and
(7.) candidate must demonstrate the potential and desire to *151 work effectively with the staff toward a solution of his problems.
These criteria must be met and will be verified by the staff prior to the candidate’s acceptance into the program. Previous convictions or adjudications are not necessarily impediments for entry into the program except as previously indicated. It should also be noted that defendants who are remanded because they cannot raise bail are eligible.
In substance, entry into the program is upon motion by the accused with notice to the District Attorney within 30 days of arraignment; there is a waiver of the right to a speedy trial— prosecution is deferred — and then, after a preliminary investigation and evaluation report to the Administrative Judge who, after hearing the District Attorney’s position, if any, makes the ultimate determination to accept or reject a defendant for participation in the Midway Program. If accepted, a defendant then receives approximately one year, or more if need be, of intensive service and supervision by a special Probation Department staff who are limited to a case load of 20 to 25 cases for each counselor. During this time, prosecution is held in abeyance and the matter is removed from the Trial Calendar of the County Court, subject to being restored at any time in the event that the defendant does not measure up to the demands of the program. The defendant is offered this opportunity at a time of intense personal crisis (immediately after arraignment on indictment), at a time when he or she should be most responsive to facing reality and to undertaking a serious commitment to one’s own life as well as to society at large. Upon successful completion of the program, a defendant is returned to court where the pending charges may be substantially reduced or dismissed upon motion of the District Attorney made before the Administrative Judge of the County Court.
One of the purposes of the program has been to test the hypothesis that early intervention and the possibility of eventual dismissal provides incentive as well as opportunity for a defendant to realize the compelling need for a permanent change and to find a positive direction in life. This came at a time when no other methodology on the county, State or national scene appeared to be stemming the tide of an ever-ascending criminal curve and the remorseless recidivism which wallowed in its wake.
The terms of the LEAA award provided initially for a *152 project director and five probation counselors (the theory being that the smaller the case load, the more total the individual supervision). Mental health, employment, vocational guidance, educational direction, health and counseling services were provided by department specialists or referral to outside agencies, which encompassed psychiatric, psychological, drug, educational, family and job counseling.
Because of the limited case load of 20 cases per counselor stipulated in the initial grant, the number of persons who could participate in Operation Midway was extremely limited at its inception.
During the four years of the program’s development and growth, the original LEAA grant has been twice renewed with the county and State each contributing their share. Midway staff has been gradually increased to 25 probation officers, five supervisors, one project supervisor, a training specialist, a court liaison officer with each probation officer maintaining a maximum case load of 20 to 25 cases.
The co-operation and participation of other government agencies and groups have contributed in large measure to the spiralling success of the program. From the very onset, the Administrative Judge of the County Court, or his Judge designate, has exercised personal dominion over the program. The District Attorney as well as defense attorneys have heretofore given the program their support as have local health, mental health, employment and welfare agencies, schools and universities.
Midway staff is specially trained to utilize a variety of counseling and treatment modalities and to work with the families of defendants. A unique aspect of the program is the participation of defense counsel in the treatment team. Treatment is intensive, highly individualized and covers the broadest possible spectrum of needs.
Now, as a regular operational unit of the Adult Division of the Probation Department, Operation Midway gives promise of immediate as well as long-range success in reducing recidivism, rehabilitating the offender, and above all, contributing to a safer society. On that score, quarterly police checks of defendants who have completed Midway reveal an over-all 8% rearrest rate compared with rates estimated of between 50% and 80% for otherwise convicted offenders.
While it is still too early to offer totally definitive documen *153 tation of the program’s success, the early results are, to say the least, most encouraging. If its rate of recidivism continues, one can reasonably anticipate significant long-range relief in that so crucial area.
By way of statistical overview, as indicated in Table I annexed hereto — listing general statistics, dispositions and sentences — the number of motions requesting service in Operation Midway have increased at an average rate of approximately 125 per year. Since the initiation of the project through September 24, 1975, 1,420 defendants have been accepted; of these, 573 have completed the program and have gone to final disposition. Of the 1,420 cases accepted, 139 were returned to the regular Trial Calendar by the Administrative Judge upon recommendation of the project counselor due to the defendant’s failure to respond to project treatment.
As Table I also indicates, charges were dismissed upon motion of the District Attorney for nearly 50% of all persons who successfully completed the program — a dramatic testament to the confidence of both the County Court and the District Attorney in the project.
From a criminal justice standard, the best measure of success is, of course, in rearrest (recidivism) figures. Because the project has been fully operational for less than two years, it is difficult to assess this sensitive area accurately. However, after four years, Table II (also annexed) based upon a sample of 386 completed cases, shows a felony recidivism rate of 3.6% and an overall recidivism rate of 13.7%. This is a well-nigh incredible accomplishment when compared with the recidivism rate of those who are sentenced to our penal system. Although this data is obviously inconclusive and continues to be further evaluated by the American Bar Foundation, among others, it is a strong indication of the direction and effectiveness of the program which clearly emerges as a signpost along the pathway of the future. Its statistics whisper with compelling authority! Indeed, it projects the vision that perhaps Midway is in fact the probation of the future. It does Nassau County most proud!*
Table III (annexed) contains a statistical breakdown of rearrests by specific crime.
*154 Table IV (annexed) shows the Midway Offense at the time of acceptance and the rearrests in each category.
Both Tables III and IV transparently illumine the fact that Midway has not hesitated to take on sensitive and hard-core felony cases, running the entire gamut from class B through class E felonies. It has accepted the challenge, the opportunity and the danger inherent in its work with a total commitment to its responsibilities. It has gambled its all on the human condition, and by every rational standard of measurement it has persevered. Are we now to make it vulnerable to the ardor of prosecutorial' advocacy, however well-intentioned? This court thinks not! Midway has come too far — with such richness of promise — to now become supinely acquiescent to other than the court itself.
The climactic consideration for acceptance into Midway now is, always has been, and ever will remain a potential for self-redemption within and for restoration to the community without. A prosecutor’s concern with conviction must yield to the higher purpose of individual reclamation. As sentence is the sole prerogative of the court, so too must a referral to Midway remain the exclusive domain of the Judge. This is a privilege of the judicial office not to be bartered in the marketplace of the law.
A protestation of guilt is not a prerequisite for admission to Operation Midway — nor is it a precursor of one’s capacity to respond successfully to its rehabilitative process. A refusal to confess is merely one factor to be weighed in determining eligibility for Midway rather than a conclusory consideration resulting in mandatory denial. No agency possesses a greater capacity for evaluating one’s potential for rehabilitation as well as for the accomplishment of that end than the depthlessly dedicated and extraordinarily expertised probation personnel who people Operation Midway. Prosecution deferred is by no means prosecution denied. Rehabilitation is a most desirable substitute for incarceration whenever circumstances so warrant, and the District Attorney of this or any other county should ever be a willing accomplice in so lofty an enterprise.
There is never a conclusion of a single Midway case without the prior knowledge, consent and motion of the District Attorney. His role is at the conclusion by motion for disposition rather than at the inception by consent. "Consent” in this instance is but a euphemism for "Veto” and "Veto” is but a *155 synonym for "Destroy”. Operation Midway’s past and present deserve far more than for it to become prey to so uncertain a future.
The District Attorney acknowledges in his moving affidavit that the court may adjourn a case for a stated reasonable period of time without his consent. Indeed, it was upon this premise that the Operation Midway timetable was originally predicated. However, the District Attorney contends that an extended adjournment, absent his consent, is an abuse of discretion inuring to the prejudice of the prosecution. It is the view of this court nonetheless that an adjournment for participation in Operation Midway is as important — if not more important — than an adjournment to prepare a defense for trial. The rich, long-range rewards to be reaped by a defendant as well as by society from participation in Midway are so manifest that they beggar further comment.
It is our view that the judicial power is compromised when a Judge, who believes that a defendant should be admitted to Operation Midway in the interest of justice, finds that before he may do so, he must reckon with a zealous prosecutor possessed of the power to veto the sound exercise of his (the judge’s) discretion. (See People v Tenorio, 3 Cal 3d 89; People v Superior Ct. of San Mateo County, 11 Cal 3d 59.) In Tenorio (supra) the court also said (p 94): "[W]hen the decision to prosecute has been made, the process which leads to acquittal or to sentencing is fundamentally judicial in nature.”
See also Esteybar v Municipal Ct. for Long Beach Judicial Dist. of Los Angeles County (5 Cal 3d 119), where a California Penal Code Section requiring the consent of the prosecutor for the reduction of a charged offense from a felony to a misdemeanor was declared unconstitutional; and see too, People v Clay (18 Cal App 3d 964) which declared the veto power of the prosecutor over the determination to grant probation unconstitutional.
In People v Navarro (7 Cal 3d 248), the court found unconstitutional as a violation of the separation of powers doctrine, a section of the California Welfare and Institutions Code conditioning the commitment of persons to a narcotic treatment center upon the consent of the prosecutor.
In Matter of Hassan v Magistrates’ Ct. of City of N. Y. (20 Misc 2d 509, 511), Justice Irwin J. Shapiro said: "The executive authority executes and enforces the law. Acting through a District Attorney or the Attorney-General, the charged viola *156 tion of law is formulated and the criminal proceeding initiated. It is then for the judiciary to interpret and apply the law in the particular case where the charge is made.” (Emphasis supplied.)
Based upon a favorable recommendation of this court, the defendants Jerry A. Fusco and Michael Fusco were admitted to Midway on September 24, 1975, and have been successfully participating in the program ever since.
Finally, the District Attorney urges that because there are police officers involved, the "charges here * * * strike at the very integrity of the criminal justice system” and that therefore these defendants must be denied Midway straight out and proceed to trial forthwith.
This court concludes, however, that these charges of perjury and assault hardly warrant so awesome an assertion. To put it quite plainly, there is hardly a case within the ken of this court which does not involve a police officer, and these indictments are no exception.
The court acknowledges the submissions of The Legal Aid Society, the Nassau County Bar Association and the Nassau Lawyers Association in opposition to this motion.
In view of the foregoing, this motion is in all respects denied.
*157 TABLE I
GENERAL STATISTICS
Dec. 1, Dec. 1, Dec. 1, Dec. 1, Dec. 1
1970-1971-1972-1973-1974-
Nov. 30, Nov. 30, Nov. 30, Nov. 30, Sept. 24, Grand
1971 1972 1973 1974 1975 Total
Motions filed requesting service 234 374 470 602 669 2,349
Cases accepted for treatment 115 183 ■ 280 351 491 1,420
Motions rejected as unsuitable 41 59 128 109 139 476
Motions withdrawn 7 32 37 42 34 152
Motions rejected for quota 0 119 5 20 0 144
PROJECT DISPOSITIONS AND SENTENCES
Project Dispositions Sentences
All charges dismissed 255 Unconditional discharges 198
Reduced to violations 150 Conditional discharges 67
Reduced to misdemeanor — class B 42 Probation to midway 30
Reduced to misdemeanor — class A 64 Probation to regular probation 20
Reduced to felony — class E 13 Committed (drug facility) 3
Reduced to felony — class D 2 Total 318
Reduced to youthful offender 47
Total 573
TABLE II
(A.) General Recidivism Data
Total sample cleared 386
Total rearrested , " 53
Total not rearrested 333
Total recidivism rate 13.7%
Total percentage nonrearrest 86.3%
(B.) Rearrest Breakdown by Type of Crime
Total number rearrested for felonies 14 — 3.6%
Total number rearrested for A misdemeanors 35 — 9.1%
Total number rearrested for B misdemeanors 2 — .5%
Total number rearrested for violations 2 — .5%
Total recidivism rate 13.7%
(C.) Dispositions and Sentences for Rearrested Group
Dispositions Sentences
Dismissed 17 Unconditional discharges 9
Violations 11 Conditional discharges 13
Class B misdemeanors 3 Probation — 3 years 10
Class A misdemeanors 18 Probation — 5 years 4
Class E felonies 3 Committed 0
Class D felonies 1
(D.) Percentage of Cases Returned to the Court Calendar through Dec. 31, 1974 — 11%
*158 TABLE III
Breakdown of Rearrests by Specific Crime
Crime No. Rearrests
Possession dangerous drug 6th as misdemeanor 14
Driving while intoxicated as misdemeanor 12
Burglary 3d as felony ^
Possession and sale of narcotics as felony
Felonious possession of narcotics W
Petit larceny as misdemeanor tO
Possession stolen property as misdemeanor tO
Resisting arrest as misdemeanor H
Assault 3d as misdemeanor I — 1
Forgery as felony 1
Sexual Abuse as misdemeanor 1
Driving while impaired as misdemeanor 1
Loitering for the use of drugs as misdemeanor 1
Assault 2d as felony 1
Robbery as felony 1
Possession of a forged instrument as misdemeanor 1
Theft of services as misdemeanor 1
Disorderly conduct as violation 1
Harassment as violation 1
TABLE IV
Operation Midway Offense at Time of Acceptance Number of Persons Rearrested in Each Category
Nonrecidivists Recidivists Total
Sale and possession of a dangerous drug 152 18 170
Possession of a dangerous drug 58 8 64
Robbery 24 3 27
Grand larceny 8 1 9
Burglary 51 18 69
Possession of a weapon 2 0 2
Forgery 6 0 6
Arson 1 0 1
Criminal mischief 4 0 4
Assault 2d 12 2 14
Sexual abuse 1st 1 0 1
Criminal possession stolen property 6 1 7
Rape 1 0 1
Criminal possession forged instrument 2 1 3
Bribery 0 1 1
Conspiracy 2 0 2
Felonious driving while intoxicated 1 0 1
Unlawful imprisonment 1 .V 0 1
Reckless endangerment 1 0 1
Totals 333 53 386

. S.798, 93d Cong., 1st Sess. (passed Oct. 4, 1973)

. H.R. 9007, 93d Cong., 1st Sess. (1973)

 In this day and age of the budget conscious, one of Midway’s most compelling credits is a cost factor of only $1,700 per defendant for one year of supervision, as compared to $10,000 per defendant for one year of incarceration.